IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * CRIMINAL NO. SAG-23-0022 |
| | * |
| JUSTIN RIGGS, | * |
| | * |
| Defendant. | * |

*******

**GOVERNMENT'S OPPOSTION TO DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS**

The United States of America, through its attorneys, Erek L. Barron, United States Attorney for the District of Maryland, and Christine Goo and Sean Delaney, Assistant United States Attorneys for said District, respectfully submits this Opposition to the Defendant's Motion to Suppress Statements, ECF No. 47.

**INTRODUCTION AND PROCEDURAL BACKGROUND**

On January 9, 2023, the Defendant Justin Riggs had his initial appearance on a Criminal Complaint charging him with the use of interstate facilities to carry on an unlawful activity, also known as the "Travel Act," specifically bribery in the State of Maryland, in violation of 18 U.S.C. §§ 1952(a)(3) and 1952(b)(1), and MD Code, Criminal Law, § 9-201, using a communication facility to commit a drug felony, specifically aiding and abetting in the distribution of controlled dangerous substances, in violation of 21 U.S.C. §§ 843(b) and 21 U.S.C. 841(a), and conspiracy to distribute controlled dangerous substances, in violation of 21 U.S.C. § 846. On January 19, 2023, a grand jury indicted the Defendant on conspiracy to distribute controlled dangerous substances, in violation of 21 U.S.C. § 846, eight counts of use of a communication facility to commit a drug felony, specifically aiding and abetting in the distribution of controlled dangerous substances, in violation of 21 U.S.C. §§ 843(b) and 21 U.S.C. 841(a), and one count of violation

1

of the travel act, specifically bribery in the state of Maryland, in violation of 18 U.S.C. §§ 1952(a)(3) and 1952(b)(1), and MD Code, Criminal Law, § 9-201.  ECF No. 17.  On November 15, 2022, the Defendant filed the instant Motion to Suppress Statements.  ECF No. 47.

## STATEMENT OF FACTS

In April of 2022, a member of law enforcement in the state of Maryland (MD) was approached by an individual (CHS) who wished to provide information about a drug trafficking organization ("DTO"). Shortly afterward, Maryland State Police (MSP) registered the CHS as a confidential human source.  The investigative team including the Defendant, a member of the Maryland State Police Western Region Enforcement - Narcotics Section ("WRENS"), assisted with the investigation into the DTO and had access to information about the CHS, and the investigation at large.

In April, July, August, September, October, November, and December of 2022, the CHS made multiple controlled purchases of distribution amounts of cocaine, suspected cocaine, methamphetamine, and suspected methamphetamine from members of the DTO, including Drug Distributor 1.  Those controlled purchases were surveilled and recorded by investigators with MSP and federal law enforcement.  WRENS had been utilized extensively by investigators to assist in the MSP investigation of the DTO.  At all times during this portion of this investigation, the Defendant was a member of the WRENS squad that assisted these controlled purchases.

### The Leak by the Defendant

On December 19, 2022, the Defendant created a fictious Facebook Account.  On December 21, 2022, the Defendant used the fictious Facebook Account to message Drug Distributor 1.  The following are selected messages sent by the Defendant, initiating that contact:

2

| Time (UTC) | Message |
|---|---|
| 14:45 | Hey I work for a Fed agency that has started a very serious case. Im looking to receive payment for info I can give you and hopefully work with you for info you need in the future. As a good faith measure I'll let you know something that proves I'm worthy. There's a tracker on your black truck. Under the rear passenger side wheel well. It's hidden good. It's a magnetic black box looking unit. If you remove it, it will alert us. So decide how you want to use that. I'd suggest having someone drive it to the far end of the us to throw everyone off. Also check your ring camera. Yesterday morning at around 310am, you'll see two feds attempting to put another tracker on. They turned around once your spot light came on… |
| 14:47 | I have tons more info pertaining to your biggest informant whose doing you dirty, the status of your case and what you should do, and alot more. But that info will require payment because I know how serious it is |
| 14:54 | Theres a big case man. I'm not reaching out because I care what you're in to or not in to. you don't have to play innocent to me. IDC about that. I'm just trying to get paid. But there's a big case that's going on. Im here to work with you. I gave you some free info to prove my worth. Once you find the tracker and see I'm legit then let's talk about the other info I have. |
| 15:25 | Also I wouldn't have [redacted] Thursday. Your [redacted] is bugged. Along with ppl that go to it. Okay well that's all I can offer man. I know the consequences of what this info will do that's why the price is what it is |
| 15:26 | I'll leave it up to you as to how we proceed. You know what I need man. I'm here for you and on your side |
| 16:06 | That's why I need money for the info. I know what'll happen to the rat. You may not have the money but your club does. And this case is going to hurt alot of members. But anyway. Just holler when you want to move forward man. |
| 20:14 | The tracker is on your truck. Underneath on the passenger side near the wheel well. I was on cover surveillance when it was put on man. I know 100% noone is feeding me bs. |

The conversation between Drug Distributor 1 and the Defendant continued through December 22, 2022. Drug Distributor 1 located the tracker on his vehicle. In subsequent Facebook messages the Defendant suggested relocating the tracker to an "18 wheeler" or driving the truck to a local police station in order to confuse law enforcement.

Also, during the discussion on December 22, 2022, Drug Distributor 1 told the Defendant

3

that he was looking to leave the organization. The Defendant then offered his continuing services to the DTO in the event that Drug Distributor 1 was no longer going to be involved in the DTO. The following are selected messages sent from the Defendant to Drug Distributor 1:

| Time (UTC) | Message |
|---|---|
| 13:21 | …So listen, if you're getting out or want nothing to do with what I can offer, is there anybody trustworthy in your club that would have interest in my services? Info for money exchange type of thing? |
| 13:22 | I could be willing to give you some more info now for forwarding my services to someone that could use it |

In December 2022, a scheduled meeting for the DTO was moved at the direction of Drug Distributor 1 after he received the messages from the Defendant. During the meeting, DTO members were told that the meeting was being held due to a "GPS tracker" having been found on a DTO member's vehicle.

On December 26, 2022, the discussion between the Defendant and Drug Distributor 1 continued regarding the Defendant's knowledge of the investigation using Facebook Messenger. The following are some of the communications the Defendant sent to Drug Distributor 1:

| Time (UTC) | Message |
|---|---|
| 14:54 | Did you pull the tracker off? I can help you by telling you how deep the investigation is. How to make it go away, who your snitch is that's setting y'all up, and when your phone will be tapped… |
| 15:00 | Gotchya. Yah it will send an alert once removed. I think they're going to try to put another one of this week. I can't communicate with you once the wire tap starts. That's why I'm going offline tomorrow. But like I said I can help you. By telling you the snitch. Once he's gone then you're case should be gone because he won't be able to testify against you |

On December 30, 2022, Drug Distributor 1 stated to the Defendant: "doubt u r being fed

4

lies cause now I'm hear shit on my fucking phone and this shits bothering me. Who if feeding u these lies man. Drop the phone or call me. Shits old but I now want answer. I can't get that kind of money but I want answers man. Give me something $$$."

On January 2, 2023, the Defendant responded and began to negotiate a price with Drug Distributor 1 and continued to do so through Tuesday, January 3, 2023. The following is a portion of the conversation that occurred between the Defendant and Drug Distributor 1 from January 2-3, 2023:

| | |
|---|---|
| Defendant: | I can't answer without payment. Even a small payment I can get you your answers |
| Drug Distributor 1: | I can get $1200 |
| Defendant: | Can you do $2000? |
| Drug Distributor 1: | I had enough trouble trying to come up with this I'm [redacted] out of this [redacted] I'd like to have some kind of information that I can leave behind in case somebody is wrapped up in whatever this bullshit is but it ain't got nothing to do with me man I don't even got it like that I can try |
| Drug Distributor 1: | I got $1500 and let u know where I put it. |

[Tuesday, January 3, 2023]

| | |
|---|---|
| Defendant: | Okay. Just put it in a grocery bag and drop it off at [redacted] wolfsville Rd, smithsburg. There's an old cabin there. Across from the cabin in a small foot bridge. Just set it in the woods by the foot bridge |
| Defendant: | I'll go ahead and give you the info. I trust you'll drop the money and won't screw me |
| Defendant: | I can't answer without payment. Even a small payment I can get you your answers |
| Drug Distributor 1: | I've been waiting on this info you said you were going to send so I can drop this money off. |

5

| | |
|---|---|
| Defendant: | So the one who is putting this case on you drives the [redacted]. The one who has been doing controlled buys from you each week. He buys from you and hands it over to feds. He's been wearing a wire each meet up. He's got ya on [redacted] buys as well as the [redacted]. I believe he has shit on [redacted] too |
| Defendant: | A good way to get him would be to sell him fake shit and later on ask him how it was |

Later in the conversation:

| | |
|---|---|
| Defendant: | If you make the 1500 drop then I'll just give ya the rest of the info and you can make the 300 drop |
| Defendant: | Every buy he's done hasbeen recorded. The audio conversations have been recorded. But he plans on testifying on ya… |

Later that day, Drug Distributor 1, informed the Defendant that he had left $1,800 in US currency behind the dumpsters in the rear of the Red Roof Inn Hagerstown – Williamsport located at on E Potomac Street, in Williamsport, Maryland. On Thursday, January 5, 2023, at approximately 7:59 a.m., Drug Distributor 1 messaged the Defendant and stated: "The money is there man […] and I'm not going back to get it…." At approximately 9:52 a.m., a silver Nissan Rogue stopped near the dumpsters of the Red Roof Inn. The older, white, male driver, Person 1, exited the vehicle and retrieved the U.S. currency that had been hidden behind the dumpsters. At approximately 10:20 a.m., after Person 1 left the vicinity of the Red Roof Inn, the Defendant messaged back: "Okay I'll get it sometime. What else do you need." Drug Distributor 1 responded, "run one of my dudes for a warrant" and the Defendant responded, "Okay I can do that."

On Friday, January 6, 2023, the Defendant responded and said, "[…] No warrants." Drug Distributor 1 then provided another name for the Defendant to run for a warrant check and then asked the Defendant if he received the money, "I'm figuring u got that $$$$ ???" The Defendant

6

confirmed that he did receive the money and stated, "Yeah got it. Okay." On January 6, 2023, FBI investigators applied for and obtained criminal complaint from the United States District Court for the District of Maryland for the Defendant.

**Defendant's Arrest and Statement to Law Enforcement**

On January 7, 2024, at 6:51PM, the Defendant was told by a MSP supervisor to report to MSP Barrack O, a barrack located in Hagerstown, Maryland. The Defendant drove there himself in his MSP issued Nissan Pathfinder. At approximately 7:14PM, after entering the building, the Defendant was arrested by members of the FBI. The Defendant was searched and prepared to be transported to Baltimore County Police Department Precinct 2, located in Woodlawn, Maryland. At approximately 7:50PM, the Defendant was placed in an FBI vehicle and seated next to Task Force Officer Jared Stern ("TFO Stern")[1] with the FBI. The Defendant was handcuffed with his hands in front of him and on his lap. The vehicle was driven by Task Force Officer Sergeant Brian Patterson ("TFO Patterson")[2]. A recording device was concealed within the FBI vehicle, a Chevrolet Tahoe, and recorded the statement by the Defendant. Prior to asking the Defendant any questions, TFO Stern read him a form labeled Warning and Advice of Rights to Provide Information on a Voluntary Basis, and also provided him a copy of the form, which he signed. This form combines an advisement related to *Garrity* advisement and also a Miranda warning. *See* Gov. Exh. 1. TFO Stern asked the Defendant if he had any questions, and the Defendant said no. TFO Stern then asked the Defendant if he would be willing to speak with them, and the Defendant stated that he would. The Defendant asked for clarification whether he could stop the interview at any point, and both TFOs Stern and Patterson acknowledged that he certainly could stop the

---

[1] TFO Stern is employed by the Baltimore Police Department and is a Task Force Officer assigned to work at the FBI.
[2] TFO Patterson is employed by the Baltimore Police Department and is a Task Force Officer assigned to work at the FBI.

interview at any point. The Defendant was also advised of 18 U.S.C. §1001, which advised the Defendant about the fact that making false statements to federal law enforcement is a crime. TFOs Stern and Patterson then began a voluntary interview with the Defendant, which ended at approximately 9:03PM.

## ARGUMENT

The Defendant moves to suppress the statement he gave to the FBI on January 7, 2024 based on two grounds: the first is that the combined *Miranda/Garrity* warning was constitutionally defective and secondly that the FBI did not obtain a valid waiver from the Defendant. The Government opposes this motion.

### A.    Miranda/Garrity Warning

Before law enforcement can perform a custodial interrogation of a suspect, agents must inform the suspect, in some manner, that: (1) he has the right to remain silent; (2) his statements may be used against him at trial; (3) he has the right to the presence of an attorney during questioning; and (4) if he cannot afford an attorney, one will be appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). While the warnings do not have to be given in same way that they are written in the Miranda opinion, law enforcement must convey Miranda's essential message to a suspect. *Duckworth v. Eagan*, 492 U.S. 195, 201-02 (1989); *Cummings v. Polk*, 475 F.3d 230, 240-41 (4th Cir. 2007). If the proper *Miranda* warnings are not given to a person, that person is not in a position to make a knowing and intelligent invocation or waiver of those Miranda rights.

Once a defendant unambiguously invokes his *Miranda* rights, law enforcement must cease all questioning. *Tice v. Johnson*, 647 F.3d 87, 107 (4th Cir. 2011). If the assertion of the right to remain silent is ambiguous, further questioning may be permitted. *See, e.g.*, *Berghuis v.*

8

*Thompkins*, 560 U.S. 370, 380-82 (2010) (extending the rule regarding invocation of the right to counsel announced in *Davis v. United States*, 512 U.S. 452 (1994) to invocation of the right to remain silent); *United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006). Whether a possible invocation is ambiguous or not is determined from the perspective of a reasonable agent in the same circumstances. *United States v. Lei Shi*, 525 F.3d 709, 729-30 (9th Cir. 2008). In *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Supreme Court explained the rationale for requiring unambiguous invocations of the right to remain silent. The Court noted that the requirement results in an objective inquiry and provides guidance to agents on how to proceed in the face of ambiguity. *Id.* at 381.

There are different implications in obtaining statements by Government employees. The Supreme Court in *Garrity*, "held that "'loss of job" is a 'penalty' that cannot be imposed on the exercise of the Fifth Amendment privilege." *United States v. Ortino*, 2019 U.S. Dist. LEXIS 208235, *13. Furthermore, "(t)he *Garrity* Court reasoned that the choice between incriminating oneself and suffering the threatened penalty, such as loss of a job, is "the antithesis of free choice to speak out or to remain silent." *Id*. at *14. Furthermore:

> In all of the cases flowing from Garrity, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure.

*United States v. Indorato*, 628 F.2d 711, 716 (1st Circuit 1980).

At the time of the Defendant's arrest on January 7, 2023, he was employed by MSP as a trooper. He was placed in custody by members of the FBI, who later interviewed him. The FBI did not employ the Defendant and was not interviewing him related to any type of administrative

9

procedure involving his employment with MSP. Moreover, the FBI task force officers who interviewed the Defendant had no power to compel him to provide any statement regarding his official duties as a trooper with MSP. They were also abundantly clear as to what the interview was for and about. At the beginning of the "Warning and Advice of Rights to Provide Information on a Voluntary Basis", the Defendant was informed that, "the matter under investigation is criminal in nature and constitutes one or more violations of law. You are not being compelled to provide information regarding your official duties pursuant to an agency disciplinary investigation or proceeding by your employer." Unlike *Garrity*, there was no threatened penalty. If the Defendant chose to not speak with law enforcement at that time, he had every right to refuse to speak with law enforcement. It was not a compelled statement. TFO Stern then proceeded to read him his *Miranda* rights. These advisements were given to the Defendant verbally and he was also shown the form. There was no confusion presented to the Defendant when he chose to speak with law enforcement following his arrest.

Defense counsel cites to the *Seibert* case and argues that there is some similarity because of a "two-step procedure". Before the *Seibert* court was a two-part interrogation in which law enforcement first questioned a suspect, then gave *Miranda* warnings, and then continued with the interrogation. *Missouri v. Seibert*, 542 U.S. 600, 604-605 (2004). They ultimately held that the "question-first", warnings second, thwarted the purpose of *Miranda* and rendered the coerced confession inadmissible. *Id*. at 617. In the case *sub judice*, the Defendant was advised that it was not a compelled statement, and then he was given very clear *Miranda* warnings. The warnings in this case were not in conflict with each other. If the Defendant chose to not speak with law enforcement, there would have been no administrative consequence or penalty. Therefore, there

was no violation of *Garrity* in this instance and the warnings in this case were not constitutionally defective.

### B.   Validity of *Miranda* Waiver

Defense counsel also argues that law enforcement did not obtain a valid waiver of rights from the Defendant.   A valid waiver of Miranda rights requires a Court to find that "the relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Cristobal*, 293 F.3d 134, 139 (4th Cir. 2002) (*quoting Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). Secondly, a court must find that the "'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 140. "When analyzing the totality of the circumstances, courts have considered such factors as the suspect's 'intelligence and education,' his 'age and familiarity with the criminal justice system,' and 'the proximity of the waiver to the giving of the Miranda warnings.'" *United States v. Hunter*, 63 F. Supp. 3d 614, 620, 2014 U.S. Dist. LEXIS 152185, *9 *quoting Poyner v. Murray*, 964 F.2d 1404, 1413 (4th Cir. 1992). The Defendant in this case, joined Maryland State Police in February of 2012. When he was arrested in January of 2023, he had been a Maryland State Trooper for over a decade.  As a veteran with MSP, he was given training on how to safely place a person in custody, and how to give proper Miranda warnings. The Defendant was present for Miranda warnings being given, at the very least, during his time as a trooper. In fact, the Defendant had been promoted to a position where he was member of a team that assisted with narcotics investigations in the Western region of Maryland.  The Defendant knew what his Miranda rights were.   After being read the "Warning and Advice of Rights to provide Information on a Voluntary Basis", the Defendant very quickly and easily responded when asked if he wanted to speak with law enforcement while he was on his way to Baltimore, he responded:

| | |
|---|---|
| TFO Stern: | A lot of this is gonna be up to you. Right. And what you decide to do here. So, you know, uh, you know, you've been doing this as a career. I think, you know, how on the Fed side, uh, you know, accepting responsibility for the things that have been done goes a long way. And I think that, uh, you know, you know, which is probably in your best interest, but, uh, at the end of the day, you, you're the one that has to make that decision on how you want this to play out. Okay? |
| Defendant: | Yeah. Yeah. |
| TFO Stern: | So I would like to talk to you about, in essence, the communications that you had under Marcy Jones. Mm-Hmm. Specifically right now. Um, you know, tell me, tell me about, just… |
| Defendant: | I don't wanna say, you know, anything incriminating or, or any, anything of that nature that's, as you know, I want to be 100%, you know, honest with you, I just Right. Don't wanna say I'm not the best with the words, so I don't wanna say the wrong thing and…getting myself into more trouble…. |

Def. Exh. 2, minute mark 18:12.

The Defendant was very deliberate in listening to the questions and answering selectively. The Defendant made a knowing and voluntary waiver of his rights and agreed to speak with law enforcement, as he so chose. He made a knowing and valid waiver of *Miranda*, when he spoke with law enforcement on January 7, 2023.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Defendant's motion be denied.

Respectfully submitted,

Erek L. Barron
United States Attorney

/S/ Christine Goo
Christine Goo
Sean Delaney
Assistant United States Attorneys
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
Phone: (410) 209-4800

Date:  December 6, 2024

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of December, 2024, a copy of the foregoing opposition was served via CM/ECF to all counsel of record.

/S/ Christine Goo
Christine Goo
Assistant United States Attorney