**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | |
| | * | **Criminal No. SAG-23-022** |
| **JUSTIN ERNEST RIGGS,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENSE SENTENCING MEMORANDUM

Justin Riggs spent a decade as a decorated and successful Maryland State Trooper – earning Trooper of the Year twice, saving lives, keeping his community safe and serving on the front lines of civil unrest and mass shooting incidents. Yet during a two-week period in late 2022 and early 2023, overwhelming financial pressure, severe PTSD, and cognitive impairment from toxic chemical exposure led to a catastrophic lapse in judgment that has destroyed his career and separated him from his wife and young children.

Mr. Riggs now seeks a four-year sentence, which is double the top of his 18-24 month advisory guideline range. This fully accounts for both the seriousness of the offense and the extraordinary circumstances that produced it. After more than 28 months in pretrial detention with no disciplinary infractions and extensive rehabilitation, a four-year sentence would satisfy the goals of justice while allowing this first-time offender to reunite with his family and rebuild the life of service that has defined him. The record demonstrates that Mr. Riggs' brief criminal conduct was an aberration born of crisis, not character, and that additional incarceration beyond four years would constitute punishment "greater than necessary" to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a).

1

**I.    Mr. Riggs' History and Characteristics Favor a Four-Year Sentence**

    **a.    Mr. Riggs' Upbringing was Marked by Major Challenges**

Justin Riggs grew up in a household where financial instability and conflict created lasting damage that would shadow him into adulthood. From his earliest years, he learned that expressing vulnerability was forbidden; seeking help was viewed as weakness; and economic uncertainty was a constant.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████

This emotional suppression was compounded by financial issues. ████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████  An Accurint search for criminal cases involving Mr. Riggs father runs fifteen pages and includes accusations of fraud (2007, 1988, 1985, 1984), theft (2008, 2007, 1984), acting as a contractor without a license (resulting in a conviction in 2007 and 2008), failure to perform a contract (2008), bad checks (1988), unemployment insurance fraud

(resulting in a conviction in 1985), and forgery of private documents (1984). Robert Riggs Sr. Accurint Report, Ex. 1. Mr. Riggs' attempts to relieve ongoing pressure through misconduct only worsened the family's financial circumstances.

The aggressive behavior of Mr. Riggs' father also led to meaningful contact with the legal system when Justin was four years old. In November 1993, Mr. Riggs' father was charged with four felonies and eleven misdemeanors following a domestic violence incident involving his wife. *See Maryland v. Robert Riggs*, Case No. 00623009U2, Ex. 2. The charges included assault, battery, false imprisonment, first degree sexual offenses of force/threat and force/suffocation, as well as malicious destruction of property. *Id*. The case resulted in a plea of guilty to misdemeanor battery and a one year suspended sentence. *Id*.

Turmoil and change were constants for Mr. Riggs when he was young. The Riggs family moved at least eight times during his first 17 years, sometimes living with relatives when they had no housing of their own. For years, they maintained a post office box in Middletown, MD solely to preserve school district eligibility. Family vehicles were repossessed, and they relied on food stamps for essential nutrition. To help support his family, Justin and his brother Bobby began working alongside his father at a young age, shouldering adult responsibilities before they were equipped to handle them.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

### b. Education and Entry into the Law Enforcement Profession

Mr. Riggs was a good student and a committed athlete in high school who is remembered long after his graduation. Lorne Ridenour, a retired Frederick County teacher praised Mr. Riggs' "leadership skills" and the fact that he was an "unselfish teammate" who would "always put his team first and would have done whatever was asked of him to help his team be successful." Lorne Ridenour Letter, Ex. 3 at 18. He added, "[a]fter thirty years of teaching and coaching, I can say that I have never worked with a harder working and committed student." *Id*. Although Mr. Ridenour realizes Mr. Riggs made an "uncharacteristic mistake," he is "capable of being an outstanding father, husband and community member." *Id*.

Another teacher and coach, Tim Leber, described Mr. Riggs, who was known by the nickname "Peanut", as "the type of kid that all coaches love" because he was "[h]ard-working, competitive, dedicated, unselfish" and had a "great attitude." Tim Leber Letter, Ex. 3 at 23. Mr. Leber closed by writing:

> I would like to close by saying that the [C]ourt needs to know that Justin "Peanut" Riggs is a highly-respected young man in our community! We all make mistakes, and "Peanut" knows that what he did was wrong. But all of us in the Middletown area love him[.]

*Id*.

Mr. Riggs was nearing graduation from high school without a clear plan for his life. He never spoke to a guidance counselor in school and career placement assistance was limited. Although he expressed a desire to enter the marines, an ex-marine football coach encouraged him to attend college first. Mr. Riggs applied to West Virginia University in his senior year because

some of his friends planned to attend. With his 3.2698 GPA, he was quickly accepted and matriculated. Justin Riggs High School Transcript, Ex. 4.

Mr. Riggs took college seriously but also enjoyed his newfound independence in Morgantown, West Virginia. He declared a criminology major after attending an exhibit in a campus building. To stimulate interest, representatives from the major had set up an interactive crime scene that was designed to make forensics seem exciting and impactful.

Mr. Riggs got off to a somewhat slow start academically, but his performance improved markedly over time. He graduated with an overall GPA of 2.54 and had virtually all As and Bs in his final four semesters, with three A+ grades in his senior year. *See* Ex. 5, West Virginia University Transcript. As he was nearing graduation, Mr. Riggs began applying to law enforcement agencies. A family friend with a connection in the Maryland State Police made an introduction. After completing an application and a multi-stage interview process, Mr. Riggs was accepted into the force.

### c. Mr. Riggs Had a Distinguished Career in Law Enforcement for Over a Decade

Justin Riggs entered the 138 member Maryland State Police Trooper Candidate Class on January 16, 2012 and finished six months later with a 91% average, 46th in his class overall. Selections from J. Riggs MSP Personnel File, Ex. 6 at 7-8.[1] Field training reports showed that he had early promise. For example, an early letter in his personnel file noted that "Trooper Riggs has no problems or concerns with his training and feels comfortable to patrol alone." Ex. 6 at 3. He "performed very well during his field training" and "will be a valuable asset to the Department." *Id*.

---

[1] To provide a focused submission to the Court, the defense has included selections from Mr. Riggs' personnel file. A complete copy of his 606 page personnel file can be made available to the Court upon request.

*Eastern Shore Patrol*

Mr. Riggs dove into work as a police officer during the early stages of his career and thrived in the fast paced and data driven culture. In order to qualify for awards like trooper of the year, the department looked at holistic factors like how a trooper interacted with the public but also overall success on recorded metrics like traffic stops, arrests and prosecutions. Mr. Riggs was highly successful in all respects and received trooper of the year in his region during both calendar years 2013 and 2014. Ex. 6 at 5-6. The letters congratulating Mr. Riggs on this accomplishment commended his "continuous efforts to keep the citizens of Maryland safe exemplify [his] commitment to the mission of the Maryland State Police." *Id.*

Notes from the early stages of Mr. Riggs career illustrate the challenges and demands of the job. For example, in a period of two weeks, Mr. Riggs was commended for assisting a subject with bipolar disorder and "found ways to relate to him" in order "to keep him calm and cooperative" Ex. 6 at 4. Later that week he was involved in a traffic stop where the driver "failed to stop" and then "threw CDS onto the highway at high speeds" but Mr. Riggs "remained calm and composed through the entire incident" *Id.*

In 2013, Mr. Riggs demonstrated extraordinary courage during a traumatic incident in Salisbury, Maryland. What began as a routine DUI stop escalated when the suspect attempted to flee. As Mr. Riggs' partner reached into the vehicle to extract the driver, the suspect accelerated, dragging the officer down the road. Mr. Riggs' partner discharged his service weapon in self-defense, striking the suspect, while the partner's leg was run over. After the suspect's vehicle flipped, the suspect collapsed in a nearby field with a severe neck wound pumping blood onto the ground. Despite the man's continued hostility, Mr. Riggs immediately transitioned from law enforcement officer to lifesaver, applying gauze to the wounds and working methodically to

contain the bleeding from the man's neck. This life-saving intervention exemplifies both his commitment to preserving human life regardless of circumstance and illustrates the type of traumatic, high-stress situations he routinely faced throughout his law enforcement career, experiences that inevitably accumulated psychological toll.

External agencies noticed Mr. Riggs' unusually effective police work. For example, Mr. Riggs was given the 2015 "Baltimore City Public Safety Operation Award" for his work assisting in the aftermath of the protests that erupted following the arrest of Freddie Gray. He was commended for serving on the front lines in a situation that led to property damage of $20 million and the injury of 175 police officers. Ex. 6 at 2. He received a commendation ribbon from the Howard County Police Chief thanked him for guarding evacuated businesses during the catastrophic Ellicott City flood of July 2016. Ex. 6 at 13-14.

Mr. Riggs was part of the first group of officers to respond to the Capital Gazette shooting on June 28, 2018, when a man named Jarrod Ramos barricaded the newspapers offices and opened fire with a 12 gauge shotgun, killing five employees. In the chaos of the initial response, it was unclear how many shooters were present or how many people had been injured or killed. However, the scene was strewn with blood and all the office building residents were understandably afraid. Mr. Riggs and his three partners began entering office buildings in the complex, leading people to safety while also seeking to identify the active shooter or other threats. A letter acknowledging Mr. Riggs' "assistance responding to the offices of the Capital Gazette newspaper on June 28, 2018" was placed in his personnel file. Ex. 6 at 1. Mr. Riggs will never forget the sight of the victims, the blood strewn hallways of the newspaper or looks of terror on the faces of the people he led to safety in the immediate aftermath of the shooting.

*Western Region Gang Enforcement Unit*

Following a promotion to corporal in 2019, Mr. Riggs was sent to start a new gang enforcement unit in parts of western Maryland that were largely untouched by proactive police work. Mr. Riggs initially joined just one other officer and began building drug cases by working his way up the chain – arresting users, using them to make arrests of dealers and then building larger cases. Mr. Riggs' work performance was praised by his superiors. For example, his 2019 performance review explained that "Cpl. Riggs demonstrates hard work, a positive attitude, and adaptability to any situation. [He] continues to improve his proficiency as a newly promoted first line supervisor." Ex. 6 at 11. His 2019 performance review found that he "exceeds expectations in all 30 categories assessed. Ex. 6 at 12.

Mr. Riggs never shied away from difficult and dangerous situations, with lasting effects on his mental health. In June 2022, he exhibited extraordinary courage during a mass shooting incident in Smithsburg, Maryland. A disgruntled employee at a local car fabrication shop returned to his workplace with firearms and methodically killed three coworkers who had ridiculed him.[2] After fleeing in an orange Chevrolet, the shooter was intercepted at a roundabout where Mr. Riggs and other state troopers executed a tactical vehicle maneuver. When the suspect began firing at law enforcement, striking a sergeant in the shoulder, Mr. Riggs found himself in a chaotic firefight. A fellow officer fired at the suspect, striking him three times. The gunman only ceased his attack when his weapon jammed, at which point he discarded it and surrendered while yelling "just kill me." What distinguished Mr. Riggs' actions that day was not just his bravery under fire, but his

---

[2] *See* Ashley R. Williams et al., *Maryland shooting suspect was factory employee, police say; 3 victims identified: What we know*, USA Today, June 10, 2022, *available at* https://www.usatoday.com/story/news/nation/2022/06/13/mass-shooting-smithsburg-maryland-columbia-machine/7612341001/.

immediate transition from law enforcement officer to lifesaver once the threat was neutralized. Though the suspect had just attempted to kill Mr. Riggs and his colleagues – and had already killed three innocent people – Mr. Riggs immediately provided support, cutting the man's clothes off and providing trauma care while the officer waited for medical staff to arrive. The man involved in the shooting, Joe Esquivel, survived and eventually pleaded not guilty by reason of insanity.[3]

### *Involuntary Transfer to the Narcotics Unit*

Mr. Riggs' success in the gang unit led to a complicated situation within the broader MSP organization. There were inherent rivalries and overlapping responsibilities between Mr. Riggs' gang unit and the western region narcotics task force. Members of the narcotics task force felt that the upstart gang unit was overshadowing them and infringing on their areas of responsibility. MSP leadership nevertheless combined the two units, which came with a complicated requirement; Mr. Riggs would be tasked with working undercover in the service of broader narcotics investigations. Mr. Riggs protested that transitioning from overt gang sweeps to covert narcotics infiltration would put him, without undercover experience, into the sights of the very traffickers he had just finished arresting. But supervisors did not budge. The desire to improve the overall performance in the region seemingly left MSP with no better choice.

The timing of this transition could not have been worse. ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[3] Julie E. Greene, *West Virginia man offers mental-heath plea in Smithsburg mass shooting*, The Herald-Mail, Sept. 1, 2022, available at https://www.yahoo.com/news/west-virginia-man-offers-mental-151427300.html.

██████████████████████████████████████████████

████████████████████████████

Despite these issues, his personnel file shows no dip in performance. Mr. Riggs 2022 performance evaluation explained that he "has done an outstanding job this year with criminal arrests. He is always willing to help the group by providing experience and hard work." Ex. 6 at 9. Mr. Riggs work was found to exceed expectations in 24 of 30 categories and to meet expectations in the other six categories. Ex. 6 at 10.

### d. Mr. Riggs and his Wife Kayla are the Committed Parents of Two Young Children, and this Case has Taken an Enormous Toll on the Family.

Mr. Riggs' sought to overcome the challenging aspects of his own childhood and is an unusually devoted father to two young children, ████ (age 7) and ████ (age 5). As his mother-in-law Linda Boring attests, he "was involved and hands-on in every aspect of their care, from diaper changes, to bottle washing, to baths, to doctor appointments. He read to them every single night, and never missed an activity of theirs. His children adore him and have truly suffered his absence." Linda Boring Letter, Ex. 3 at 9. Mr. Riggs took an active role in his children's growth through coaching his son's soccer and baseball teams and continuing family traditions, like the Riggs' family's monthly family gatherings. His church community member Cathie Clemson observed that Mr. Riggs "wanted his children to grow up in his hometown, with the people who loved him and helped him grow up." This desire to provide his children with the stability and community connections he valued reflects his thoughtful approach to parenting.



What makes the current separation particularly devastating is its timing at a critical developmental period for both children, who were just under three and four years old when their father was arrested. Despite the constraints of incarceration, Mr. Riggs has made extraordinary efforts to maintain his connection with his children. He speaks with them weekly via phone and video calls, and, according to his wife Kayla, "sends them drawings on a consistent basis." Ex. 3 at 4. Mr. Riggs is fully committed to his parental role even under the most challenging circumstances.



Kayla Riggs, who continues to serve the community as an elementary school guidance counselor, has shouldered the enormous burden of single parenthood while maintaining a career in public service. She has completed her seventh year at Smithsburg Elementary School, where she provides crucial emotional and academic support to young students. The stress of managing a demanding professional role while raising two small children alone has been compounded by financial hardship. Following Mr. Riggs' arrest, Kayla was forced to sell their family home, as her single salary could not cover the mortgage. She now struggles to afford the $1,850 monthly rent for a house she chose primarily to minimize disruption for the children by keeping them in the same school district. She has had to sell various family assets including their tractor, 4-wheeler, motorcycle, and Mr. Riggs' vehicle, and has been unable to keep the children in the daycare center they had attended for years.

The return of Mr. Riggs to his family while his children are still relatively young would not only reunite the family but would also alleviate the severe emotional and financial strain

currently threatening their stability. As Kayla continues her important work as an elementary school guidance counselor, Mr. Riggs' return would restore the balanced partnership that allowed both parents to pursue meaningful employment while providing their children with the attention and care they need.

### e. Mr. Riggs Led a Life of Faith and Service to the Community Beyond His Law Enforcement Work.

Beyond his professional and family responsibilities, Mr. Riggs has demonstrated a consistent pattern of community service that reflects his core values and character. Mr. Riggs has been a lifelong member of Grossnickel Church of the Brethren in Myersville, MD. His active involvement extended to teaching Sunday school to high school-aged students, which required a significant investment of time and careful guidance of young people at a pivotal moment in their lives. As numerous letters of support noted, Mr. Riggs participated in disaster relief trips organized by his church.[4] Ex. 3 at 11, 14-15, 22.

Mr. Riggs' generosity manifested not only in formal volunteer work but also in countless informal acts of assistance. As Kayla describes, he "is always a reliable friend to call upon in any situation from car trouble to moving to house repairs." Ex. 3 at 2. Even with limited financial resources as a young adult, "Justin would put money in the offering plate at church every Sunday," prioritizing charitable giving over personal comfort. *Id*. This ingrained spirit of service has persisted even during his incarceration, where he has found creative ways to help others. His wife shares that "Justin has recently shared that he is putting small drawings with encouraging notes into the pages of books at the library at the Correctional Facility, in the hopes that when another inmate opens the book they feel a little joy." *Id*.

---

[4] *See* Grossnickle Church of the Brethren, *Disaster Response*, https://www.gcob.org/disaster-response.

13

This pattern of selfless service reflects fundamental aspects of Mr. Riggs' character that predated and will outlast his current legal circumstances. As his wife observes, he possesses an "innate ability to help others without being asked or without hesitation," and "will be leaving incarceration with a renewed mission to help others." Ex. 3 at 2. These testimonials from those who know him most intimately reveal a man defined not by a lapse in judgment, but by a consistent pattern of service, generosity, and concern for others' welfare that began long before his offense and has continued even under the most difficult circumstances.

## II.    A Four Year Sentence Fully Accounts for the Nature and Circumstances of the Offense

Mr. Riggs' offense conduct, while serious, must be understood in the context of professional burnout, psychological distress, financial desperation, and impaired decision-making that converged during a roughly two week period in late 2022 and early 2023.

### a.    Mr. Riggs' Efforts to Leave the Force by Starting Small Businesses

By 2021, after a decade in law enforcement, Mr. Riggs was experiencing profound burnout and seeking a transition to "civilian" life. Rather than simply resigning without a plan, which would have been shocking to his family, he sought to build an alternative career path by establishing a furniture business, Oak & Steel.[5] Mr. Riggs expanded the furniture store into a coffee shop called Brew 30 within the space. This was a well-intentioned but ultimately ill-fated attempt to increase foot traffic and revenue. Managing these dual businesses while still working full-time as a state trooper created an untenable situation. Mr. Riggs was building furniture, serving coffee, managing and handling payroll for 5-8 employees, and attempting to meet the physical and

---

[5] See Angela Roberts, *New Middletown furniture shop combines wood and metalwork in one-of-a-kind pieces*, The Frederick News-Post, Sept. 23, 2021, available at https://www.fredericknewspost.com/news/arts_and_entertainment/new-middletown-furniture-shop-combines-wood-and-metalwork-in-one-of-a-kind-pieces/article_393a3ac7-c0fa-5d26-a14c-0c52d243b0c6.html.

emotional demands of law enforcement. This overwhelming schedule deprived him of sleep, time with his young family, and any opportunity for psychological well-being. As his business struggled during the COVID-19 pandemic, Mr. Riggs accumulated tens of thousands of dollars in credit card debt, nearly a hundred thousand dollars in debt related to his small businesses, as well as a substantial mortgage and a car loan with a balance in excess of thirty thousand dollars. *See* Justin Riggs Experian Report, Jan. 1, 2023, Ex. 7.

The financial strain quickly became crushing. Mr. Riggs concealed the severity of these financial problems from his wife – a pattern that can arguably be traced to his upbringing, where his father had modeled both financial irresponsibility and an inability to manage stressors productively. Mr. Riggs' brother explained to Dr. Jonathan DeRight that this was "how [they were] raised. You keep that to yourself and man up and take care of it the best you can." Dr. Jonathan DeRight Report, Ex. 8 at 6. When the business ultimately failed, the accumulated debt and sense of personal failure created overwhelming pressure that clouded Mr. Riggs' judgment precisely when he most needed clarity.

    **b. Dr. DeRight's Neuropsychological Report Illustrates that Compounding Stress and Trauma Led to Extremely Poor Decision Making**

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

    **c.** **Exposure to Controlled Substances and Escalating Alcohol Consumption**

Mr. Riggs' deteriorating psychological state in the months preceding his offense was further compromised by his hazardous exposure to controlled substances during drug disposal operations and his uncharacteristic increase in alcohol consumption.

Following the closure of a proper incinerator facility in 2021 due to EPA violations, Mr. Riggs was required to participate in a dangerous makeshift drug disposal process that involved burning seized narcotics in open metal barrels. ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



The combination of toxic chemical exposure and increasing alcohol consumption further compromised the judgment and decision-making capacity of a man already struggling with severe PTSD, financial pressure, and cognitive vulnerabilities in problem-solving and risk assessment.

### d.  The Offense Conduct Occurred During a Short Period of Time

The offense conduct occurred over approximately two weeks in December 2022 and January 2023. This was not a calculated criminal enterprise developed over months or years, but rather an impulsive, desperate response to overwhelming financial pressure and psychological distress. As Dr. DeRight observed, Mr. Riggs had the ability to "blend in" with others as needed through his policing experience, but he was fundamentally "not adept at being" a criminal. *Id.* The awkwardness and ineffectiveness of Mr. Riggs' approach in the messages speaks to how foreign criminal conduct was to his character and core values.

### e.  Mr. Riggs Has Fully Accepted Responsibility

Mr. Riggs has genuine remorse for his actions and fully accepted responsibility for his conduct. In Dr. DeRight's assessment, Mr. Riggs views himself as "a failure" who has "let [his]

kids down." *Id*. at 7. This self-assessment reflects his fundamentally sound moral compass and intact capacity for empathy and remorse, even as he struggles with the consequences of his actions. His acceptance of responsibility through a guilty plea has saved judicial resources and spared the government the need for a trial.

III.    **The Guidelines Calculation in this Case is Far Below the Bottom End of the Plea Range, Favoring a Four Year Sentence.**

      a.    **The Defense Agrees with the Guideline Calculation in the PSR**

The defense does not contest the guideline calculation contained in the presentence investigation report, which leads to a total offense level of 15. PSR ¶ 23-34. With a criminal history category of I, Mr. Riggs advisory guideline calculation is 18-24 months.

      b.    **Mr. Riggs' Time in Custody Has Already Exceeded the Top End of His Guideline Calculation**

Even at the high end of Mr. Riggs advisory guideline range, 24 months, he has already served more time than the Sentencing Commission – after extensive study and data analysis – recommend for his offense conduct. Here, the bottom end of the plea range is <u>double</u> the high end of Mr. Riggs' guideline calculation and the top end of the plea range is <u>more than four times</u> the top of his guideline calculation. This strongly counsels in favor of a four year sentence.

It is well established that the more a Court diverges upward from the presumptively reasonable advisory guideline calculation, the more compelling the facts and circumstances supporting the departure must be. *See United States v. Swain*, 49 F.4th 398, 403 (4th Cir. 2022) ("[t]he farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be") (internal citations and quotations omitted); *Gall v. United States*, 552 U.S. 38, 50 (2007) ("We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one"). For all the reasons described in

this memo, extending Mr. Riggs' incarceration beyond four years would require an extraordinary justification that simply does not exist.

### c. No Actual Harm Occurred, and Any Theoretical Harm is Inconsistent with Solicitation to Commit Murder.

The Government has indicated it may seek an upward variance based on a theory that Mr. Riggs' conduct was "analogous to a solicitation to commit murder." *United States v. Riggs*, Plea Agreement ¶ 8. This does not accurately reflect the offense conduct in this case. Mr. Riggs' actions – which involved providing information about an investigation and an informant to a target in exchange for money – are materially different from soliciting violence against a specific person with the intent to kill them.

If the Court were to consider cross-references to other guidelines, Mr. Riggs' conduct more closely resembles the elements of involuntary manslaughter under U.S.S.G. § 2A1.4, which involves the "reckless" creation of risk, rather than a solicitation to commit murder under § 2A1.5, which requires actual intent that a murder be committed.[6] In other words, Mr. Riggs' conduct involved the reckless disclosure of information that could have, and fortunately did not, result in harm.

This distinction is critical in determining a just sentence. The starting base offense level for reckless involuntary manslaughter pursuant to § 2A1.4(a)(2)(A) is 18. Accounting for Mr. Riggs acceptance of responsibility (3 points) and the fact that he meets the criteria at USSG §

---

[6] *See United States v. Blevins*, 397 F. App'x 72, 76 (5th Cir. 2010) ("To find a defendant guilty of solicitation of murder-for-hire, the jury must find: (1) that the defendant intended for another person to commit murder-for-hire and (2) that the defendant induced or tried to persuade that other person to commit murder-for-hire."); *see also United States v. Holveck*, 867 F. Supp. 969, 977 (D. Kan. 1994) ("To obtain a solicitation conviction under 18 U.S.C. § 373, the government must prove two elements: (1) that the defendant intended, as evidenced by strongly corroborative circumstances, for Brandau to commit a murder").

4C1.1(a)(1)-(10) (2 points), his total offense level pursuant to § 2A1.4(a)(2)(A) would be 13. This is lower than his total offense level of 15, as calculation by probation. PSR ¶ 23-34.

**IV.    A Four Year Sentence Accounts for Other Relevant Statutory Factors.**

      **a. "Just Punishment" Would be Achieved by a Four Year Sentence Due to the Massive Collateral Consequences.**

Mr. Riggs will experience punishment far beyond his period of incarceration because of collateral consequences that will continue long after any sentence is completed. As described in *United States v. Nesbeth*, "the collateral consequences of a felony conviction form a new civil death" because "[c]onvicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights." 188 F. Supp. 3d 179, 182 (E.D.N.Y. 2016). This idea is vividly illustrated by this case. Mr. Riggs is a first time offender, and the consequences of this case have fundamentally altered the trajectory of his life and his family's future.

Due to the offense conduct and this case, Mr. Riggs has lost not just a job, but an entire professional identity and career. Aside from the two week lapse in judgment that led to this case, Mr. Riggs honorably served the public for over a decade. This distinguished career – built on years of sacrifice, danger, and dedicated service – has been permanently extinguished. Relatedly, Mr. Riggs faces significant restrictions on his future employment opportunities. He will be barred from professions that require licensing, background checks, or security clearances, the fields he might otherwise qualify for based on his prior career. Any future entrepreneurial endeavors will face significant hurdles, as many business loans and insurance policies are unavailable to people with felony convictions. Mr. Riggs must completely reinvent himself professionally, carrying the permanent stigma of a federal conviction as a former law enforcement officer, with a degree in criminology, into an uncertain job market.

Mr. Riggs has endured profound public humiliation during the pendency of this case. The media has covered the case extensively and unflatteringly.[7] Although he has a supportive church community, as documented in numerous letters of support, Mr. Riggs will no doubt experience humiliation and ostracism in the small, tight-knit community where he was once a respected public servant.

Mr. Riggs' family has suffered and will continue to experience extreme strain that has fundamentally altered their lives. His wife Kayla has been forced to shoulder the enormous responsibility of raising two young children alone while maintaining her career as an elementary school guidance counselor. The *Nesbeth* court specifically noted that collateral consequences impact not only the convict, but also his family, which can be taken into account at sentencing. *Nesbeth*, 188 F. Supp. 3d at 188.

The financial consequences for Mr. Riggs and his family have been devastating and will persist long after his release. As detailed in Kayla Riggs' letter, Mr. Riggs' incarceration eliminated half of the family's income, forcing her to sell their home and important assets. She now struggles to afford the $1,850 monthly rent for a house chosen primarily to minimize disruption for the children. Ex. 3 at 4. Beyond these immediate financial losses, Mr. Riggs has lost his MSP pension. Justice does not require extending Mr. Riggs' separation from his family and young children, particularly when a four-year sentence would adequately acknowledge the

---

[7] *See*, *e.g.*, Danny Tow, *Former state trooper pleads guilty to bribery, drug charges*, WBFF Baltimore, https://www.msn.com/en-us/news/crime/former-state-trooper-pleads-guilty-to-bribery-drug-charges/ar-AA1zMC94?ocid=BingNewsVerp; Julie R. Greene, *Maryland State Police officer with Hagerstown ties accused of leaking drug case info for money*, The Herald-Mail, Jan. 10, 2023, https://www.heraldmailmedia.com/story/news/local/2023/01/10/md-state-police-officer-could-face-up-to-30-years-for-leaking-critical-hagerstown-drug-case-info/69794266007/; Gabriele Lewis, *Former state trooper from Frederick County pleads guilty to bribery, drug charges*, Yahoo! News, Feb. 25, 2025, https://www.yahoo.com/news/former-state-trooper-frederick-county-045900319.html.

seriousness of the offense while recognizing the substantial punishment already inflicted through significant collateral consequences.

### b.  A Four Year Sentence Provides Sufficient Deterrence

#### i.  Specific Deterrence is Served by a Four Year Sentence Due to the Danger and Intensity of a Serving a Federal Prison Sentence as a Former Law Enforcement Officer.

Mr. Riggs' status as a former law enforcement officer will make his sentence "more difficult, stressful and punitive. Affidavit of Jack T. Donson, Ex. 10 at 6.[8] Once he enters the Bureau of Prisons (BOP) he will be subject to a "vetting" process whereby other inmates will demand Mr. Riggs "show his papers" by providing copies of court documents related to his case. *Id.* at 4. Mr. Riggs' will face an impossible choice – present his "papers" and be exposed as a former police officer or decline and face consequences such as being placed in highly restrictive housing. *Id.* at 4-5. Either way, Mr. Riggs is likely to be exposed as a former state trooper and ostracized by both other inmates  and correction officers, who will view him as a "dirty cop." *Id.*

Mr. Riggs will also likely be placed further from his family because he is a former police officer. *Id.* at 5. Because Mr. Riggs worked narcotics cases in an undercover capacity, there is a risk that if placed close to home, which is the BOP policy, he may have contact with someone he investigated or arrested. *Id.* at 5. To minimize that risk, BOP will designate law enforcement officers to facilities out of their home region. *Id.* If Mr. Riggs is transferred out of his region for his protection, he could end up many hundreds of miles from his family making it harder for him to be an involved parent.

---

[8] As detailed in his affidavit and cv, Mr. Donson retired from the BOP after twenty-three years and now works as a consultant on issues related to classification, designation, and other BOP matters.

Ordinarily, someone entering BOP with Mr. Riggs' history and offense conduct would be designated to serve their sentence at a minimum security camp. *Id.* at 3. But two facts in the case increase the risk of Mr. Riggs being placed in a security category higher than he normally would be placed in.

The first of these facts is the reference to a machinegun purchased by the DTO and later sold to CHS and transferred to investigators. PSR at ¶ 7. The transfer of the firearm took place months before Mr. Riggs' offense conduct began. It is referenced to provide background to the Court, but Mr. Riggs played no role in the obtaining or transferring of the firearm.

Second, the conduct the government contends is analogous to a solicitation to commit murder may also be used to increase Mr. Riggs' security classification. As detailed above, the conduct is not a solicitation to commit a murder, but the BOP may nonetheless use it as a basis to increase Mr. Riggs' security rating from a minimum security facility to a low security facility. Ex. 10 at 3. The issues with "vetting" will be much more pronounced at a higher security facility than at a camp.

Although Mr. Riggs asks below for the Court to approve the waiver of the factors that would increase his security rating, Mr. Riggs' sentence will be harsher, regardless of where he serves it, because of his past employment in law enforcement. The harshness of his sentence serves as a powerful specific deterrent – especially for someone who has never been incarcerated before.

### ii.  General Deterrence is Served by a Four-Year Sentence

A four-year sentence satisfies the aim of general deterrence without needlessly extending Mr. Riggs' separation from his family. Research consistently demonstrates that deterrence is achieved primarily through certainty and swiftness of punishment rather than severity. *See*, *e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013)

(finding "certainty of apprehension, not the severity of the ensuing consequences, is the more effective deterrent"). The National Academy of Sciences has similarly concluded that "the incremental deterrent effect of increases in lengthy prison sentences is modest at best." Nat'l Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 5 (Jeremy Travis et al., 2014).

The strong deterrent message in this case stems from Mr. Riggs' immediate arrest, pretrial detention without bail, permanent loss of his law enforcement career, and plea of guilty – consequences that communicate the risks of such conduct regardless of whether the ultimate sentence is four years or longer.

### c. Protection of the Public is Achieved by a Four-Year Sentence

Mr. Riggs is not a risk to public safety. He has no possibility of reoffending in the same manner, as he will never again serve in law enforcement or hold a position of public trust. Research consistently demonstrates that first-time offenders with Mr. Riggs' characteristics – educational attainment, family and community support, religious faith, the embrace of prosocial coping strategies – have low recidivism rates. *See*, *e.g.*, U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 18 (2016) (explaining that "consistent with its previous recidivism studies, the Commission's present study found that recidivism rates are most closely correlated with total criminal history points" and finding the lowest levels of recidivism for offenders with zero total criminal history points like Mr. Riggs).

### d. Rehabilitation

Mr. Riggs has been on a rehabilitative journey for the past twenty-eight months. This includes developing effective, pro-social coping mechanisms, and avoiding disciplinary

26

infractions, despite the unique challenges former law enforcement officers face in detention settings.

The most important coping mechanism Mr. Riggs has developed is his enhanced passion for art. This artistic expression is a tool for processing trauma and managing stress in a constructive manner. Mr. Riggs has completed six mural projects throughout HCDC, transforming institutional spaces into works of beauty that benefit the entire facility community. His artistic contributions span the Educational Program Center, Mental Health Unit, Chapel, Visitation Area, Program Center Hallway, and include a mural for installation at the Howard County Department of Social Services. *See* Letter of Carien Quiroga and Mural Painting Projects Portfolio, Ex. 11. The facility has recognized the therapeutic value of his artistic abilities by assigning him as the Mental Health Unit Art Instructor, where he helps other detainees develop similar healthy expression skills.



His work on the Mental Health Unit titled "Floral Tranquility" exemplifies his commitment to serving the most vulnerable inmates. The project was specifically designed to "create a tranquil

and meditative environment for incarcerated individuals housed on the Mental Health Unit" and to "visually de-institutionalize Mental Health Unit to enhance therapeutic impact." Ex. 11 at 8. Mr. Riggs' dedication to helping fellow inmates through art therapy reflects the same service orientation that defined his law enforcement career.

Visual arts educator Carien Quiroga, who has worked with arts organizations serving incarcerated populations for 15 years, describes Mr. Riggs as "not only an inspiring artist but an exceptional human being" who "has proven to be a valuable and vital artist on the mural painting team." Ex. 11 at 1. Ms. Quiroga specifically noted his "capacity to be a positive and supportive force to his fellow artists" and his consistent ability to "share positivity, be a listening ear and provide support and words of advice to others." *Id*. She observed that Mr. Riggs "has demonstrated exceptional leadership, problem-solving and creative decision-making skills that laid the foundation for the operations and code of conduct of the Mural Painting Program" and "always gone above and beyond the call of duty to do design work on his own time." *Id*. As his Teaching Assistant on the Mental Health Unit, Ms. Quiroga praised his ability to bring "levity, positive energy and an encouraging spirit to each of our visual art sessions as we work with a challenging population." *Id*.

Ms. Quiroga's professional assessment carries particular weight given her extensive experience with system-impacted individuals. She concluded that "Mr. Riggs has an enormous capacity to have a positive impact on our society, and I know that he will succeed in all his future endeavors." *Id*. Her observation that "Justin leaves behind an undeniable positive legacy and he will be dearly missed as a part of the mural painting team" demonstrates the genuine rehabilitation Mr. Riggs has achieved through constructive channeling of his talents in service of others. *Id*. In

addition to drafting a letter, Ms. Quiroga has submitted a portfolio of Mr. Riggs artistic work. *Id.* at 2-9.

Mr. Riggs has also created a detailed sketchbook while incarcerated, allowing him to chronicle his daily life and channel his emotions.



These pages depict the chapel at HCDC. Mr. Riggs has been actively involved in Spanish and English language church services during his entire period of incarceration. The associate chaplain at HCDC, Ronald Stimeare wrote to the Court:

> Over the course of his two-year incarceration, I have had the privilege as an Associate Chaplain here at the Howard County Detention Center (HCDC), to observe Justin in various settings, as well as meeting with him weekly for individual coaching and counseling. During this time, I can truly say I have seen him genuinely demonstrate how a man can find himself at his absolute lowest, and then by the grace of God be able to be changed from within and begin to serve others out of gratitude and love for what has been done for him. . . .
>
> I can with great confidence state that Justin is someone who has allowed himself to grow and learn from his life experiences, and as such, is now an individual of great character, maturity, sound judgement and integrity. I believe when released, he will

continue to excel in each endeavor he is presented. Especially as he strives to
continue to build on a solid foundation of his love for his merciful and forgiving
God, his family and his friends.

Ronald R. Stimeare Letter, Ex. 3 at 8.

Mr. Riggs' positive and pro-social approach to his time at HCDC is also illustrated

by the detailed letter submitted by Dr. Alaina Elam, the Work Release & Reentry

Supervisor at HCDC. Dr. Elam wrote in her letter to the Court that Mr. Riggs has:

- "enrolled in the art program where participants create visual art, creative writing,
  and other forms of art" and "volunteered to assist with the design and creation of
  several murals in the facility";
- "successfully graduated from the Graphic Design class and attended meditation";
- "successfully graduated from the CDL program and works as a sanitation worker";
- "works as the facility barber";
- "signed up to participate in Family Mediation, where he would be able to mediate
  and set expectations with members of his family as he plans for his transition
  home";
- "has also been selected to sign up for our parenting program, which you must be a
  model incarcerated individual to attend";
- "selected to pilot an Observation Aide program where he was tasked with one-on-
  one monitoring of incarcerated individuals who are on suicide watch";
- "he is a peace maker and gets along well with everyone on his unit"; and
- "he created a proposal for an on-site garden that was approved and will begin soon.
  This will allow for incarcerated individuals to plant, nurture, and harvest fresh
  fruits and vegetables during their stay."

Ex. 3 at 6-7. Mr. Riggs has received certificates for completing over 100 programs,

including courses on coping with stress, treatment for alcohol problems and risk taking.

Ex. 10. A four-year sentence would appropriately recognize Mr. Riggs substantial

rehabilitative strides and his desire to make amends after a terrible lapse in judgment.

### e. Strong Post-Release Plan

Mr. Riggs has developed a comprehensive reentry plan centered on family reunification

and meaningful employment. He will return to live with his wife Kayla and their two young

children, who remain his primary motivation and strongest deterrent against future misconduct.

As Kayla notes, "The intention to never be away from his children again will also be a central reason for him to never break the law in the future." Ex. 3 at 2.

Mr. Riggs would like to pursue employment in a creative field such as graphic design, building on skills he's developed during incarceration through formal training and artistic practice. His completion of the Graphic Design class at HCDC and demonstrated talent through six facility murals position him for meaningful work that utilizes these newly enhanced abilities.

Mr. Riggs' extensive support network provides robust accountability and assistance. Numerous character letters from church congregants, family members, and community friends document strong ties that will facilitate successful reintegration. *See* Ex. 3. His lifelong membership at Grossnickle Church of the Brethren offers spiritual guidance and practical support, while his extended family's monthly gatherings ensure ongoing connection to positive influences. This combination of stable housing, employment prospects, community ties, and powerful family motivation creates a strong framework for successful reentry that serves both rehabilitation and public safety.

## **CONCLUSION**

Justin Riggs stands before this Court as a first-time offender whose distinguished decade of public service was overshadowed by a two-week lapse in judgment during a period of personal crisis. A four-year sentence, which represents double the top of his advisory guideline range of 18-24 months, balances the seriousness of his offense with the extraordinary circumstances that produced it. Mr. Riggs has already served over 28 months in pretrial detention, demonstrating exceptional rehabilitation through zero disciplinary infractions, extensive programming, artistic contributions to the facility, and service to vulnerable inmates.

With strong family support, meaningful reentry plans, and a demonstrated commitment to rehabilitation, Mr. Riggs presents minimal risk to public safety and maximal potential for positive community contribution. A four-year sentence would ensure sufficient but not greater punishment than necessary under 18 U.S.C. § 3553(a), allowing this devoted father to reunite with his children while they are still young and rebuild the life of service that has defined him.

Mr. Riggs therefore asks the Court to impose a 48-month sentence to be followed by a term of supervised release. Mr. Riggs asks the Court include the following language in the judgment and commitment order:

> The Court recommends Mr. Riggs be designated to a minimum-security prison "Camp" due to his former capacity as a law enforcement officer and lack an escape or criminal history. The Court does not object to a waiver of the public safety factor should the BOP determine it appropriate.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

_____/s/_____
ANDREW SZEKELY
ERIC PILCH
Assistant Federal Public Defenders
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
(410) 962-3692
Email: andrew_szekely@fd.org
          eric_pilch@fd.org